UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| JOCEYLN NANETTE KNOTTS, individually and in her capacity as representative of Estate of Kenneth Wayne Knotts, Deceased, *et. al*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRANDON LEDBETTER, *et. al*, <br><br> *Defendants*. | Civil Action No. 3:23-CV-2369-X |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Brandon Ledbetter, Anaid Vejar, Barry Secrest, and Donald McKenzie's (Defendants) motion to dismiss. (Doc. 27). Having considered the parties' arguments and the applicable law, the Court **GRANTS** the motion and **DISMISSES WITH PREJUDICE** Plaintiffs' claims.

### I. Background

While driving through Dallas–Fort Worth with two of his children, Kenneth Knotts (Knotts) got a flat tire. Police officers from the City of Hutchins approached him and decided he was experiencing a mental health crisis. They took Knotts into custody and transported him to the University of Texas Southwestern Medical Center for treatment.

After Knotts was admitted to the hospital, the UT Southwestern Police Department (UTSWPD) responded to a disturbance in his room. As documented in

1

Officer Ledbetter's bodycam footage,[1] Officers Ledbetter and Vejar talked to Knotts for about twenty-five minutes, asking him to wait in his hospital room and answering his many questions and concerns. While talking in the hallway, Knotts suddenly sprinted away, running several hundred yards from the hospital while Officers Vejar and Ledbetter pursued him. UTSWPD officers apprehended Knotts in the parking lot of a nearby warehouse, restrained him with double handcuffs—two pairs linked together to offer more range of motion—and drove him back to the hospital strapped to a gurney because he refused to get in a patrol car.

Back in his hospital room, officers removed all restraints but the handcuffs. Knotts asked them to take the handcuffs off. A nurse told him they could not because staff did not feel safe around him. After a few moments, Knotts became agitated, yelling loudly and suddenly for water, and the medical staff left the room.

Knotts then got up and walked over to the sink, leaning down to drink from it. The UTSWPD officers did not stop him from doing so and asked if he had enough to drink. When Knotts finished drinking, he glanced over his shoulder at the officer in the room and began to squat as if trying to reposition his cuffed hands. The officers grabbed him and led him back to the bed. Initially, he was sitting up while Officer Ledbetter tried to switch him from double to single handcuffs, but Knotts got increasingly agitated. This is where Plaintiffs contend the excessive force began.

---

[1] The Court summarizes facts from Plaintiffs' Second Amended Complaint (Doc. 23) and the bodycam footage Plaintiffs cite in that complaint. "[W]here video recordings are included in the pleadings . . . the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video blatantly contradicts those allegations." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (cleaned up).

2

The other officers got involved, turning Knotts over and pushing him down across the hospital bed as he knelt on the ground. The officers held him down using their hands and forearms on his shoulders, lower back, and buttocks. He continued to resist, at one point grabbing one of the officers and groaning and grunting. Knotts yelled, "I can't breathe," and the officers repositioned. One officer held down each of his shoulders while another had a hand on his lower back, and they held his arms in place.

About thirty seconds later, medical staff injected Knotts with a sedative, at which he yelped. Eighty seconds after that, all officers but Ledbetter released Knotts and backed away. Officer Ledbetter continued leaning on Knotts with his forearm on Knotts's shoulder and arm for about forty more seconds. Medical personnel discussed their plan for treating Knotts before realizing he was nonresponsive. The medical staff flipped Knotts over onto the bed and attempted to revive him, but they were unsuccessful.

Knotts's parents, Jocelyn Knotts and Kenith Price; Ladonna Blanchard, the mother of two of Knotts's children; and Nekeisha Sanders, the mother of two of Knotts's children (collectively, "Plaintiffs"), filed this action seeking redress for the wrongful death and constitutional violations they allege Knotts suffered at the hands of the defendant officers.

## II. Legal Standard

Federal Rule of Civil Procedure 8 requires a pleading to state "a short and plain statement of the claim showing that the pleader is entitled to relief."[2] The pleading standard does not require detailed factual allegations, but "[t]hreadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice."[3] For a complaint to survive a motion to dismiss under Rule 12(b)(6), it "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[4] A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[5]

For the purposes of a motion to dismiss, "the court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the nonmoving party, [but] the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video blatantly contradicts those allegations."[6] Generally, the district court is constrained to the pleadings when deciding a motion to dismiss, but "the court may consider documents

---

[2] Fed. R. Civ. P. 8(a)(2).

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Id.* (cleaned up).

[5] *Id.*

[6] *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (cleaned up) (relying on bodycam footage when the complaint conflicts with the video and considering the footage even when plaintiffs did not attach it to their pleadings but merely referenced it).

attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim."[7]

Here, Plaintiffs cited to and included screenshots from the officers' bodycam footage, but they did not attach the videos to their Second Amended Complaint.[8] Defendants were the ones to file the footage with the Court as exhibits to their motion to dismiss, but the Court will consider the footage because Plaintiffs referred to it extensively, cited to it, and included screenshots from it, effectively incorporating it into their pleadings.

However, in their live complaint, Plaintiffs did not cite to the separate and additional exhibits they attached to their response to Defendants' motion to dismiss. Therefore, the Court will not consider those additional documents here.

### III. Analysis

Defendants claim the doctrine of qualified immunity shields them from all the plaintiffs' claims.[9] Qualified immunity shields government officials from civil liability, provided they did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."[10] When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate why it doesn't

---

[7] *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (cleaned up); *accord Stevenson v. Tocé*, 113 F.4th 494, 501 (5th Cir. 2024) (acknowledging that district courts "may consider documents referenced in, but not attached to, complaint if documents assist the plaintiff in establishing the basis of the suit," even though the lower court chose not to consider such documents in this case (cleaned up) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000) (cleaned up))).

[8] Doc. 23, at 4–11.

[9] Doc. 28 at 17.

[10] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

apply.[11] A "plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[12]

If the court determines the official violated a statutory or constitutional right, it then asks whether "the defendant's actions were objectively reasonable in light of law which was clearly established at the time of the disputed action."[13] If so, qualified immunity still applies.[14]

Plaintiffs allege Defendants used both excessive and deadly force in restraining Knotts, violating his Fourth and Fourteenth Amendment rights.[15] Excessive force claims are necessarily fact-intensive and dependent on "the facts and circumstances of each particular case."[16] "Claims that law enforcement unreasonably utilized deadly force are treated as a special subset of excessive force claims."[17] Excessive force claims are analyzed exclusively under a Fourth Amendment framework of the "reasonableness" of a seizure, rather than a Fourteenth Amendment framework of due process.[18]

---

[11] *Lincoln v. Turner*, 874 F.3d 833, 847 (5th Cir. 2017).

[12] *Id.* at 847–48 (cleaned up).

[13] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (cleaned up).

[14] *Id.*

[15] Doc. 23 at 17–19.

[16] *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir. 2009).

[17] *Aguirre v. City of San Antonio*, 995 F.3d 395, 412 (5th Cir. 2021).

[18] *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Though the complaint alleged violations of both the Fourth Amendment and the Due Process Clause, we analyzed the constitutionality of the challenged application of force solely by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person, holding that the 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." (cleaned up)).

### A. Constitutional Violation

### 1. Excessive Force under the Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated."[19] It is widely understood that excessive force by police officers violates the Fourth Amendment.[20] But what counts as excessive force?

"To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[21] In *Graham v. Connor*, the Supreme Court provided factors a court should weigh when determining whether force is excessive: "[1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."[22]

The court evaluates these factors from the perspective of a reasonable officer on the scene, not from the clarity and safety of hindsight.[23] And questions of excessive force, like other Fourth Amendment questions, are measured for objective reasonableness. "[T]he question is whether the officers' actions are objectively

---

[19] U.S. CONST. amend. VI

[20] *See, e.g.*, *Roque v. Harvel*, 993 F.3d 325, 329 (5th Cir. 2021); *Graham*, 490 U.S. at 394–95; *Tennessee v. Garner*, 471 U.S. 1 (1985).

[21] *Deville,* 567 F.3d at 167.

[22] *Graham*, 490 U.S. at 396.

[23] *Id.*

reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."[24] The Fifth Circuit has determined that, "when a subject has been subdued—meaning, he lacks any means of evading custody and does not pose a threat of immediate harm—the further use of force is not justified."[25] On the other end of the spectrum, "a threat of serious physical harm, either to the officer or to others may justify the use of deadly force."[26] For the cases between these extremes, the court should consider "the totality of the circumstances."[27]

Taking Plaintiffs' allegations as true that Defendants' actions in restraining Knotts led to his death, the Court will skip to the third element: excessiveness. As to the severity of the crime, Knotts was detained due to an episode of mental illness, not for committing a crime. The first *Graham* factor weighs against the reasonableness of force. As to the threat Knotts posed to the officers and others, the medical staff communicated to Knotts that they could not remove his restraints because, "we don't feel safe with you."[28] He behaved erratically before and during restraint and physically resisted all the officers' attempts to restrain him, shouting things suddenly and sporadically. So the second factor weighs in favor of using reasonable force. And

---

[24] *Id.* at 397.

[25] *Timpa v. Dillard*, 20 F.4th 1020, 1029 (5th Cir. 2021) (cleaned up).

[26] *Id.* at 1028–29 (cleaned up).

[27] *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018).

[28] Doc. 28, Ex. A at 15:25–27.

Knotts had already escaped custody once and was actively and consistently resisting the officers' efforts to restrain him, so the third factor weighs in the officers' favor too.

In *Timpa v. Dillard*, on which Plaintiffs rely extensively, the officer held Timpa in a prone, handcuffed position, applying bodyweight force of roughly 190 pounds to Timpa's back for about fourteen minutes.[29]  The court found it significant that this was not "the paradigmatic circumstance of an officer arriving at the scene with little or no information and having to make a split-second decision in response to criminal activity."[30]  Rather, the officer arrived on the scene to find Timpa—who had called 911 himself to receive medical help for an ongoing mental health crisis—handcuffed and barefoot in the grass next to a road.[31]  Further, the court noted Timpa was not a threat to officers or others when he was face down with officers on all sides and cuffed at the wrists and ankles with his legs under a concrete bench to prevent kicking.[32] "A jury could find that no objectively reasonable officer would believe that Timpa—restrained, surrounded, and subdued—continued to pose an immediate threat of harm justifying the prolonged use of force."[33]

Knotts was a different story.  Rather than lying face down and fully restrained on the ground, the episode here began with Knotts yelling and resisting the Officers' attempts to handcuff him, trying to get away until they flip him over and hold him

---

[29] *Timpa*, 20 F.4th at 1026–27.

[30] *Id.* at 1030 (citing *Darden*, 880 F.3d at 732).

[31] *Id.*

[32] *Id.*

[33] *Id.*

9

down.  According to Plaintiffs' live complaint, Knotts knelt with his legs unrestrained but for the nearness of the officers' bodies around him.  The officers held him down with their hands on his shoulders and lower back or buttocks until he stopped actively resisting them and received a sedative from paramedics.  And once he complied and received the shot, it took only eighty seconds for all officers but Ledbetter to back away.  Most importantly, none of the officers used full bodyweight force on Knotts.  Though they held him down with their hands and forearms, they did not kneel on his back like the officer in *Timpa*.  Overall, the *Graham* factors weigh against excessive force here.

## 2.  Deadly Force

Plaintiffs contend that Defendants used deadly force when restraining Knotts. "[T]here is no magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force,' and such claims are broadly analyzed under the same general rubric of 'reasonableness' as other excessive force claims."[34]  The Fifth Circuit has long held that "the use of 'deadly force' is unreasonable where the officer does not have probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others."[35]  "And, although lower courts have struggled with whether to characterize various police tools and instruments as 'deadly force,' [the Fifth Circuit] defines deadly force as force that

---

[34] *Aguirre*, 995 F.3d at 412.

[35] *Id.* at 412–13.

10

creates a substantial risk of death or serious bodily injury."[36] The first question here is whether a jury could decide the Defendants' actions counted as deadly force.[37]

Plaintiffs argue that, under *Timpa*, prone restraint constitutes deadly force.[38] But that is vastly overbroad. In *Timpa*, the Fifth Circuit held "the use of a prone restraint with bodyweight force on an individual with three apparent risk factors—obesity, physical exhaustion, and excited delirium" to constitute deadly force when the restraint was held unnecessarily for at least five additional minutes.[39]

The Court need not decide whether Knotts was obese, physically exhausted, and in a state of excited delirium at this stage. It is dispositive that Knotts was not restrained in a fully prone position, none of the officers placed their bodyweight on Knotts to restrain him, and once Knotts stopped resisting, all four officers released him completely within ninety seconds, with only one officer holding Knotts's shoulder down for forty of those seconds. With these facts, no jury could conclude that Defendants exerted deadly force on Knotts under the existing caselaw.

The second question in a deadly force inquiry is whether Knotts posed a threat of serious harm. Because the Court has concluded the officers did not exert deadly force, it does not matter whether Knotts posed a threat sufficient to warrant deadly force. However, Plaintiffs do concede that, by the time Defendants restrained Knotts, they had just brought him back from fleeing to a nearby building and he was in an

---

[36] *Id.* at 413.

[37] *Timpa*, 20 F.4th at 1020.

[38] Doc. 23 at 15 (citing *Timpa*, 20 F.4th at 1036).

[39] *Timpa*, 20 F.4th at 1034.

"agitated" state.⁴⁰  But they contend that he did not pose a threat to the officers or others because he "did not attempt to injure the officers or others," nor did he "display or use any weapons."⁴¹  However, the video clearly shows Knotts struggle and resist when the officers first begin to switch his cuffs, trying to stand from the bed before they push him onto his knees.  The video also shows medical staff telling Knotts they cannot leave him unrestrained because they do not feel safe with him.  Regardless, Defendants did not use deadly force.

### B. Clearly Established Law

Even if Plaintiffs could show that Defendants violated Knotts's constitutional rights, they would next have to show that the violation was against clearly established law.  Qualified immunity is broad; it "protects all but the plainly incompetent or those who knowingly violate the law."⁴²  Although a case does not have to be "directly on point to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate."⁴³  The Supreme Court instructs lower courts "not to define clearly established law at a high level of generality."⁴⁴  The Court assesses each defendant's conduct individually, and once a

---

⁴⁰ Doc. 23 at 4, 7.

⁴¹ Doc. 23 at 13.

⁴² *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (cleaned up).

⁴³ *Id.* (cleaned up).

⁴⁴ *Id.* (cleaned up).

defendant asserts qualified immunity, the plaintiff bears the burden of proving that it does not apply.[45]

Use of excessive force is an area of the law "in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."[46] "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"[47]

"Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable."[48] But the cases Plaintiffs point to as clearly established law all contain material differences from these facts.[49] In *Gutierrez v. City of San Antonio*, officers hog tied the detainee—cuffing his hands behind his back and tying his feet up to his hands—tossed him in the backseat of their patrol car, and drove him to the hospital.[50] The court calls its holding in *Gutierrez* "very limited" to the circumstance of hog-tying.[51] In *Fairchild v. Coryell County*, the detainee was flat on her stomach

---

[45] *See Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007); *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012).

[46] *Kisela*, 584 U.S. at 104 (cleaned up).

[47] *Id.* at 105 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).

[48] *Timpa*, 20 F.4th at 1034.

[49] As Defendants note, one case in particular cannot be considered at all. The Fifth Circuit decided *Austin v. City of Pasadena*, 74 F4th 312, 320 (5th Cir. 2023), after Knotts's death, so it was not part of any clearly established law Defendants could have violated.

[50] *Gutierrez v. City of San Antonio*, 139 F.3d 441, 443 (5th Cir. 1998).

[51] *Id.* at 451.

while a 230-pound officer knelt on her back and a 390-pound officer pressed down on her neck with his forearm for two minutes, though Fairchild was not resisting.[52] And in *Timpa*, as analyzed above, an officer knelt on the detainee with his full bodyweight well beyond the point Timpa stopped resisting, which the court specifically notes as dispositive.[53]

In Knotts's case, no officer knelt or sat on him while restraining him. He was not hog-tied; his legs were not tied or cuffed at all. And though Plaintiffs contend he was prone while lying across the hospital bed, Knotts was not lying prone. His head and chest rested on the bed while he knelt, as the image in Plaintiffs' own Second Amended Complaint reveals.[54] When Officer Ledbetter placed the single cuffs on Knotts and began to remove the double cuffs, Officers Secrest and Vejar each had a hand on one of Knotts's shoulders as he sat upright. When Knotts started yelling and stood from the bed, some combination of officers turned him around and pushed him back onto the bed on his stomach.

Officer Secrest held Knotts's head down with his right hand on Knotts's neck until they stabilized him. Officer Vejar held Knotts's right shoulder down with one forearm, with the other across his lower back. Then, she leaned over Knotts to help

---

[52] *Fairchild v. Coryell Cnty.*, 40 F.4th 359, 362 (5th Cir. 2022).

[53] *Timpa*, 20 F.4th at 1026–27, 1034 ("The district court determined that no precedent clearly established that the use of a prone restraint with bodyweight force to bring a subject under police control was objectively unreasonable. But the district court failed to consider the continued use of such force *after* Timpa had been restrained and lacked the ability to pose a risk of harm or flight. We hold that the state of the law in August 2016 clearly established that an officer engages in an objectively unreasonable application of force by continuing to kneel on the back of an individual who has been subdued.").

[54] *See* Doc. 23 at 9, Fig. 2.

14

Ledbetter remove the double cuffs while Secrest held Knotts down with one hand on his buttock and the other on his low back. Secrest then hooked his left arm under Knotts's right, which was wrenched behind his back. When Knotts then cried out that he could not breathe and Officers Vejar and Ledbetter had removed the double cuffs, Secrest released Knotts's arm so it rested against his back with less torque.

Then came the longest period of Knotts's restraint, during which Officer Vejar secured Knotts's right shoulder with her right fist and held his right forearm in her left hand. Officer Secrest's right fist was in the small of Knotts's back while he held Knotts's right wrist in his left hand. Officer Ledbetter knelt on the opposite side of the bed with his forearm on Knotts's left shoulder. When the nurses approached to give Knotts a sedative, Officer McKenzie reached over to hold Knotts's right arm still. Shortly after the shot, Officers Secrest, Vejar, and McKenzie stepped back while Officer Ledbetter remained kneeling with his forearm across Knotts's shoulder for about forty seconds until a nurse came to hold Knotts's cuffed hands.

Based on the actions the plaintiffs allege and the bodycam footage reveals, none of the officers violated law that was clearly established. None of them placed their full bodyweight on Knotts, nor did they apply pressure to the center of his back. And once Knotts was compliant, Officers Secrest, Vejar, and McKenzie released him. Officer Ledbetter's continued restraint was to only one shoulder, it was not with his bodyweight, and it lasted only forty more seconds.

While it is certainly tragic that Knotts did not survive, none of the four officers used excessive or deadly force in restraining him, nor did they violate clearly established law.[55]

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss. (Doc. 27). Plaintiffs' claims are **DISMISSED WITH PREJUDICE** under 12(b)(6).

**IT IS SO ORDERED** this 31st day of January, 2025.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[55] Because qualified immunity disposes of all claims in this case, the Court does not need to address Defendants' arguments about the Texas Tort Claims Act or Nekeisha Sanders and Ladonna Blanchard's individual capacities to sue.